2013 Ark. App. 375

**Jesse HOODENPYLE, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR–12–469.**

Court of Appeals of Arkansas.

June 5, 2013.

---

**3.** Gordon states that he did not abstract this because of changes in the record.

Norris Legal Drafting, by: Lisa–Marie Norris, for appellant.

Dustin McDaniel, Att'y Gen., by: Eileen W. Harrison, Ass't Att'y Gen., for appellee.

DAVID M. GLOVER, Judge.

Jesse Hoodenpyle was convicted by a jury of first-degree battery for "knowingly, without legal justification, caus[ing] serious physical injury to a person he or she knows to be twelve (12) years of age or younger," Ark.Code Ann. § 5–13–201(a)(7) (Supp.2011). The victim was his two-month-old daughter, Taylor. He was sentenced to five years in the Arkansas Department of Correction. On appeal, Hoodenpyle argues that the trial court erred (1) in denying his motion for directed verdict because the State failed to prove that he knowingly caused physical injury to Taylor; (2) in allowing Taylor to be used as a demonstrative exhibit; (3) in denying his proffered jury instruction on a lesser-included offense; and (4) in denying defense counsel the ability to argue for an alternative sentence of probation or a suspended imposition of sentence. We affirm the conviction.

This is the second time this case has been before this court. We remanded the case to the trial court to settle the record because, while Hoodenpyle was originally charged with a Class Y felony, he was convicted of a Class B felony; however, the judgment and commitment order reflected that Hoodenpyle was convicted of the Class Y felony instead of the Class B felony. *Hoodenpyle v. State,* 2013 Ark. App. 114, 2013 WL 625747. This error has now been corrected, and this case is before us once again.

At trial, there was extensive testimony offered by the State. On March 11, 2010, two-month-old Taylor was admitted to Arkansas Children's Hospital (Children's) with possible head trauma. Dr. Karen Farst, a pediatrician at Children's (whose primary focus is children at risk and pediatric-emergency medicine), testified that she was asked to consult with the pediatric-intensive-care team treating Taylor on March 12. Dr. Farst testified that Taylor was initially relatively stable after being transported to Children's but was admitted to pediatric intensive care after it became clear that she was having seizure activity that required closer monitoring. Dr. Farst testified that she reviewed the CAT scan, which indicated that Taylor had cerebral edema (swelling of the brain tissue); subdural hematomas (bleeding on the surface of the brain and between the two lobes of the brain); and areas of the brain that had direct injury to them. She stated that there was no medical reason that would account for Taylor's condition.

Dr. Farst was present when an ophthalmologist performed an examination of Taylor's eyes, which revealed retinal hemorrhaging and significant and extensive bleeding in the back of both of Taylor's eyes. Dr. Farst testified that Taylor's retinal hemorrhages went all the way to the edges; that there were too many to count; that the blood in her eye chamber made it difficult to even arrive at an accurate hemorrhage count; and that the pattern of Taylor's hemorrhages was seen in children with mild to moderate head trauma.

According to Dr. Farst, she met with Hoodenpyle and his wife, Brittany, reviewed the history, and explained to them that her findings did not match the history. Dr. Farst testified that Hoodenpyle explained to her that Taylor had a fit after Brittany left for work on March 10; that he fed her and she calmed down; and that she slept until Brittany returned around 11 p.m. Brittany told Dr. Farst that Taylor "did not seem right" that night; that Taylor was more fussy and irritable; that she had a shrill, abnormal cry; that she got worse during the night; and that she called the doctor that night and took Taylor in the next morning. Dr. Farst testified that she told Taylor's parents that the symptoms were very consistent with a child who has suffered a head injury and that the symptoms were progressively getting worse as the brain began to swell. Dr. Farst said that after she relayed that information and told them there was a concern someone had injured Taylor, Hoodenpyle became upset and offered the explanation that he had dropped Taylor onto a mattress on the floor while trying to retrieve her dropped bottle; that it was an accident; and that he had not said anything because he did not think that she was injured. When she told Hoodenpyle that a fall to a hard surface from shoulder height would not have caused the degree of Taylor's trauma and that a report would be made to DHS, Dr. Farst stated that he became more upset and said that he had "freaked out" because Taylor would not stop crying; that he had shaken her and she went to sleep; but that it was "not that shaken baby thing."

Dr. Farst described Taylor's injuries as global instead of just one area of injury, with evidence of injury in multiple parts of the brain. She said that a few months after the injury, a follow-up scan indicated a significant area of permanent brain damage, that an area of Taylor's brain was "basically dead." She likened Taylor's retinal hemorrhages to the most severe cases of head trauma that she sees—retinal hemorrhages of that type were commonly seen in children who did not survive their injuries. It was her opinion that Taylor's retinal hemorrhaging was caused by rotational forces.

On cross-examination, Dr. Farst explained that children's injuries due to head trauma are a relatively new diagnosis, having been discussed since the 1970s. She stated that she is involved in trying to teach people that shaking babies can cause head trauma, and it is important to educate the public about that in an ongoing effort to prevent child abuse. She acknowledged that head trauma in children can be caused both intentionally and by accident or out of ignorance.

Brittany, Hoodenpyle's wife, testified that when she returned home on the evening of March 10, Hoodenpyle did not mention that he had dropped Taylor or that he had shaken her. She said that Taylor was fussy and would not eat, and as the night progressed, she got worse. She said that when she asked Hoodenpyle if anything had happened, he acted like everything was normal, and he continued to deny that anything had happened when they arrived at Children's. However, when Dr. Farst told them that Taylor's injuries were consistent with someone doing something to her, Brittany stated that Hoodenpyle "broke down" and said that he had dropped Taylor on the mattress and that she had rolled to the floor. Brittany then stated that she left the room after Dr. Farst said that such a fall would not explain Taylor's injuries, and Hoodenpyle admitted that he had shaken Taylor. Brittany testified that she was initially told Taylor would probably not survive, and although doctors told her that Taylor would not walk, crawl, stand, or talk because of

the brain damage, she was now speaking, crawling, and pulling up.

Dr. Patrick Casey, a developmental pediatrician, testified that he saw Taylor in Children's growth and developmental clinic. He said that the first time he saw her, she was twelve months old but was functioning at the level of a six-month old. Six months later, he noted that seizure problems had activated, and there were concerns about her eyesight and behavioral problems. He stated that his latest exam revealed that the seizure problem was more under control, although she was having difficulties with swallowing and chewing, and that while she was twenty-three months old, she was functioning at about a ten-month-old level. It was his opinion that, intellectually, she would probably progress to the seven-to-ten-year-old range.

Arkansas State Police Special Agent Joseph Pickett testified that he interviewed Hoodenpyle at Children's. The State introduced a transcript of that interview as an exhibit. In that interview, Hoodenpyle first said that he was trying to feed Taylor, that the bottle slid out of her mouth, and that she "flopped" out of his hands, hit the bed, and bounced onto the floor. He said that she cried and tensed up, and he began to panic. He stated that there was a time "when her eyes made her not look like my daughter." He admitted that he shook Taylor and told her to "stop it." He said that he thought that there must be something wrong from the fall, that she would not calm down, and that he began to panic and shook her a little bit; however, he said that it was not like "the shaken baby syndrome." Twice in his statement Hoodenpyle admitted that he had shaken Taylor, and on a scale of one to ten, he "probably shook her a six or seven." He told Trooper Pickett that after he shook her, Taylor began to calm down; that she went to sleep; that he put her in her swing; and that when his wife arrived home, Taylor would not eat for her and would instead spit up. He said that when Brittany asked him what was wrong, he did not want to tell her that he had dropped Taylor; he thought it might be connected to what happened earlier, and he was afraid to say anything. He said that by the time they took Taylor to the hospital, he thought about telling Brittany that he had dropped Taylor, but he was just hoping that everything would "come out okay." He only told someone he had shaken Taylor when he learned that she had head trauma, but he said that when he shook her, although it was like anger, he was not angry to the point of saying "shut up." He testified that when he was trying to get Taylor to "come to," there was not a thought in his head that it would ever harm her and that people who shake babies are "psycho."

The radiologist testified about Taylor's different CAT scans. She said that Taylor's head injuries were extensive, with both brain bleeding and brain swelling.

The State also requested that Taylor Hoodenpyle be introduced to the jury as an exhibit. Hoodenpyle's counsel objected on the basis that Taylor had never been disclosed as a potential witness; that it was never anticipated that Taylor would be in front of the jury; that the State had failed to disclose this in discovery; that there was no way to prepare for it; and that it was highly prejudicial. The State denied that she was a witness. The trial court stated that it recalled the State talking about its intention to have the mother bring Taylor in an earlier motion conference, and the defense could not consider it a surprise when it had been mentioned earlier. The defense argued that Taylor was not a competent witness, and it had no way to cross-examine her. The trial court ruled that she was a demonstrative exhibit

because she could not talk and would not be asked questions.

After Taylor was introduced to the jury, the State rested and the defense moved for a directed verdict. In that motion, defense counsel argued that the State had to prove that Jesse Hoodenpyle "knowingly caused serious physical injury to a person under the age of four.... Arkansas Code Annotated section 5–22–202 defines knowing as a person being aware that it is practically certain that his or her conduct would cause such a result." Counsel then argued that the State "presented no evidence that Jesse knew his conduct would cause the result of a serious physical injury." The motion was denied.

In his defense, Hoodenpyle called Dr. Barbara Lang, the executive director of the nursing program at the University of Arkansas, Fort Smith School of Nursing, who testified that Hoodenpyle entered the practical nursing program in the fall of 2009 and completed one and a half semesters. She said that Hoodenpyle did not receive any specialized training in pediatrics while he was enrolled in the nursing program.

Gary Grisham testified that he was Hoodenpyle's associate pastor and Sunday School teacher. He said that he had seen Hoodenpyle interact with his children and that nothing about that interaction caused him concern.

The defense rested and renewed its motion for directed verdict, again specifying that the State was required to prove "that Jesse knowingly caused serious physical injury to a person under the age of four, under circumstances manifesting extreme indifference to the value of human life." Again, defense counsel argued that the State failed to present any evidence that Hoodenpyle knew that his conduct would cause the physical injuries Taylor suffered. The renewal motion was denied.

*Denial of Directed Verdict*

Hoodenpyle's first argument is that the trial court erred in denying his motion for directed verdict because the State failed to prove that he "knowingly" caused serious physical injury to Taylor. A motion for directed verdict is a challenge to the sufficiency of the evidence. *Simmons v. State*, 89 Ark.App. 34, 199 S.W.3d 711 (2004). To determine if evidence is sufficient, there must be substantial evidence, direct or circumstantial, to support the verdict. *Id.* Substantial evidence is that which is of sufficient force and character to compel a conclusion one way or the other with reasonable certainly, without speculation or conjecture. *Mayo v. State*, 70 Ark.App. 453, 20 S.W.3d 419 (2000). In reviewing a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the State and considers only the evidence that supports the conviction. *Simmons, supra.*

A person acts "knowingly" with respect to his conduct or the attendant circumstances when he is aware that his conduct is of that nature or that such circumstances exist, and a person acts "knowingly" with respect to a result of his conduct when he is aware that it is practically certain that the conduct will cause the result. Ark.Code Ann. § 5–2–202(2) (Repl.2006). The element of criminal intent can seldom be proved by direct evidence and must be inferred from the facts and circumstances of the crime. *Hicks v. State*, 2012 Ark. App. 667, 2012 WL 5949103. The fact-finder need not lay aside its common sense in evaluating the ordinary affairs of life and may consider and give weight to any false, improbable, and contradictory statements made by the defendant to explain suspicious circumstances when determining

criminal knowledge and intent. *Id.* Intent can be inferred from the nature and extent of injuries. *Harshaw v. State*, 348 Ark. 62, 71 S.W.3d 548 (2002).

 Here, Hoodenpyle points to the fact that Dr. Farst testified that preventative efforts are being made by hospitals to educate people about injuries inflicted on babies by shaking them. Dr. Farst did agree that the type of injuries suffered by Taylor could be inflicted either intentionally or by accident and out of ignorance.

While Hoodenpyle stated in his interview with Agent Pickett that he did not mean to harm Taylor and that he did not shake her out of anger like "shaken baby syndrome," he also admitted in that interview that on a scale of one to ten, he shook her "probably six, seven." The medical evidence indicated that there was severe trauma that did not match the information initially given at admission. Tests revealed that Taylor had cerebral edema, subdural hematomas on both sides of the surface of her brain as well as between the two layers of her brain, and significant permanent brain damage; additionally, the retinal hemorrhaging was one of the most severe cases of head trauma that Dr. Farst had seen. Dr. Farst testified that there was no medical reason to explain the significant trauma other than an intentional or abusive injury.

Hoodenpyle attempts to deflect any culpability for knowingly injuring Taylor by stating that he was not asked specifically the history of how the injury occurred until they were at Children's and that he did not know his actions could cause the severity of the injuries Taylor sustained until confronted by Dr. Farst. However, he first told Dr. Farst that he had dropped Taylor, not that he had shaken her; it was not until after Dr. Farst told him that a fall would not produce such extensive injuries that Hoodenpyle admitted that he had shaken Taylor. It was clear that Hoodenpyle knew the night that he shook Taylor that something was very wrong; yet he said nothing that night and continued to say nothing until directly confronted. While he claims that he did not knowingly harm his daughter, medical evidence supports a different finding, and it is apparent that the jury believed that Hoodenpyle knowingly caused Taylor's injuries.

### Taylor Hoodenpyle as Demonstrative Exhibit

Hoodenpyle next argues that the trial court erred in allowing Taylor as a demonstrative exhibit because it was more prejudicial than probative to any relative element the State was required to prove and that Taylor had not been properly disclosed as a potential exhibit. We disagree.

 Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ark. R. Evid. 401 (2012). Relevancy of evidence under this rule is a matter of discretion for the trial court, whose determination is entitled to great deference. *Howard v. State*, 348 Ark. 471, 79 S.W.3d 273 (2002). Determinations regarding the use of demonstrative evidence are left to the discretion of the trial court and decisions about such are reversed only for an abuse of that discretion. *Id.*

 Hoodenpyle argues that no relevant element of the case was proved by presenting Taylor as demonstrative evidence. However, as the State points out, Hoodenpyle challenged Taylor's physician regarding the extent of Taylor's developmental disabilities as a result of her injuries. The jury was therefore entitled to see Taylor and draw its own conclusions

about her physical challenges. Her condition is not unduly prejudicial, as Hoodenpyle's actions caused her condition in the first place.

■ With regard to Hoodenpyle's argument that Taylor was not properly disclosed pursuant to pretrial discovery procedures, the burden is on him to establish that the omission was sufficient to undermine confidence in the outcome of the trial. *Weber v. State*, 326 Ark. 564, 933 S.W.2d 370 (1996). Taylor's injuries and resulting problems had been discussed and presented to the jury through medical testimony, and Hoodenpyle was obviously aware of her appearance and limitations. Hoodenpyle has failed to explain how the presentation of Taylor to the jury constituted surprise evidence that he could have rebutted had he been given notice of the State's use of her as a demonstrative exhibit.

### Denial of Instruction for Lesser–Included Offense

Hoodenpyle next argues that the trial court erred in not allowing a jury instruction on battery in the third degree as a lesser-included offense. Hoodenpyle's proffered jury instruction was that he "recklessly caused physical injury to Taylor Hoodenpyle," one of the definitions of third-degree battery. Ark.Code Ann. § 5–13–203(a)(2) (Repl.2006).

■ An instruction on a lesser-included offense is appropriate when it is supported by even the slightest evidence; however, a trial court's decision not to give an instruction on a lesser-included offense will be affirmed if there is no rational basis for doing so, and that decision will not be reversed absent an abuse of discretion. *Ratterree v. State*, 2012 Ark. App. 701, 2012 WL 6200294. Here, it is undisputed that Taylor's injuries were serious and life-threatening; there was no basis to give an instruction on simple physical injury.

### Denial of Ability to Argue Alternative Sentence

■ Hoodenpyle's final argument is that the trial court erred in denying his defense counsel the ability to argue for an alternative sentence of probation or a suspended imposition of sentence during the sentencing phase. The decision to allow alternative sentencing is reviewed for an abuse of discretion. *Benjamin v. State*, 102 Ark.App. 309, 314–15, 285 S.W.3d 264, 268 (2008). This standard of review is a high threshold, and it requires that a trial court act improvidently, thoughtlessly, or without due consideration. *Id.* Arkansas Code Annotated section 16–97–101(4) (Repl.2006) provides:

> The court, in its discretion, may also instruct the jury that counsel may argue as to alternative sentences for which the defendant may qualify. The jury, in its discretion, may make a recommendation as to an alternative sentence. However, this recommendation shall not be binding on the court.

■ In this case, the trial court held that it would not allow the defense to use the words probation, parole, or suspended sentence; however, it held that defense counsel could ask for a fine. The trial court held that if the State objected to alternative sentencing, it would not allow defense counsel to argue that because the State would have to agree to a suspended sentence, and it was not a form of sentence that could be had after a conviction in front of a jury. Nevertheless, the trial court did allow defense counsel to tell the jury that if they had a recommendation they could write it on the jury form, and defense counsel was allowed to argue to the jury that it should come up with an alternative sentence that did not require imprisonment. Defense counsel specifical-

ly argued to the jury during closing argument in the sentencing phase that sending Hoodenpyle to the penitentiary did no one any good; that the jury had the option of alternative sentences; and that he was begging the jury to brainstorm and to come up with something other than sending Hoodenpyle to a "dark, dangerous place." Defense counsel further implored the jury to think outside of the box and to come up with something other than sending Hoodenpyle to the penitentiary. We find no abuse of discretion because Hoodenpyle's counsel was, in fact, allowed to argue to the jury that it recommend an alternative sentence not involving prison time.

Affirmed.

GRUBER and VAUGHT, JJ., agree.