SLIP OPINION

Cite as 2014 Ark. App. 591

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR-14-161

| | | |
|---|---|---|
| DAVID VAN WINKLE | | Opinion Delivered October 29, 2014 |
| | APPELLANT | |
| V. | | APPEAL FROM THE POLK COUNTY CIRCUIT COURT [NO. CR-2011-137] |
| | | HONORABLE J.W. LOONEY, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED |

**PHILLIP T. WHITEAKER, Judge**

Appellant David Van Winkle was charged by amended information with one count each of kidnapping, aggravated residential burglary, first-degree stalking, second-degree battery, aggravated assault, and terroristic threatening. A Polk County jury convicted him on all six counts (reducing the second-degree battery charge to third-degree battery), and he was sentenced to a total of fifty-two years in the Arkansas Department of Correction. On appeal, he contends that there was insufficient evidence to support four of those convictions. We find no error and affirm.

## I. *Standard of Review*

Van Winkle argues that the trial court erred in denying his motions for directed verdict on the counts of kidnapping, first-degree stalking, third-degree battery, and aggravated residential burglary. A directed-verdict motion is a challenge to the sufficiency of the

evidence. *Populis v. State*, 2011 Ark. App. 334; *Draper v. State*, 2010 Ark. App. 628, 378 S.W.3d 191. When reviewing a challenge to the sufficiency of the evidence, the appellate court will affirm the conviction if there is substantial evidence to support it, when viewed in the light most favorable to the State. *Populis*, *supra*. Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or another without resort to speculation or conjecture. *Id.* With these standards in mind, we now examine the evidence presented to the jury.

## II. *Background Facts*

Van Winkle was a dentist who had a practice in Mena for twenty-six years. The victim in this case, M.O., was one of his patients. M.O. had numerous dental problems and learned that Van Winkle offered free consultations and payment plans. When she went to see him, he recommended that she have her remaining teeth extracted and get dentures. M.O. had her first tooth extraction in August 2011, and Van Winkle gave her a prescription for hydrocodone. M.O. was participating in drug court at the time, however, and was concerned about the prescription.

The day after the extraction, Van Winkle sent M.O. a text message, asking how she was doing and if she had any pain. M.O. replied that she was having a little pain. Van Winkle texted her back to inform her that she could work in his office or clean his home as part of her payment plan. M.O. thought "it was a little bit strange," but she was interested in following up because she "really needed some work done on [her] teeth."

SLIP OPINION

M.O. returned for a second tooth extraction about two weeks later. She described the procedure as "a little hasty" and said that it was "quite painful." M.O. then discussed her pain medication with Van Winkle. Van Winkle told M.O. that she could "double up" on her medication if she was in pain, but M.O. replied that she could not because she had to do a pill count with Terry Ford, her probation officer. M.O. and Van Winkle then began discussing how to hide her prescriptions from Ford. Through a series of conversations, including text messages, it was determined that M.O. should take the pain medications as needed. Van Winkle said he would give her a refill to make sure her pill count was okay. M.O., who said she was "already under the influence of pain medication," deceived Ford about the number of pills she was taking. M.O. even deleted her text messages from Van Winkle because Ford would check her phone.

After the second tooth extraction, Van Winkle told M.O. that Ford had come by his office to look at M.O.'s file. He also told her that Ford wanted to see Van Winkle's ledger to know how many refills M.O. had gotten that Ford did not know about. M.O. said it was important for her and Van Winkle to "get [their] stories straight," and so they began meeting outside of his office to go through the ledger together.

On their third visit together, M.O. went to Van Winkle's house, and they had a "general conversation." While she was there, Van Winkle asked how important it was that Ford not see the real ledger; M.O. said it was "pretty damn important." Van Winkle asked what she would be willing to do to keep Ford from finding out about the prescriptions. When M.O. asked what he meant, Van Winkle said he "just wanted a couple hours of [her] time"

and told her that he would make sure she went to prison and would never see her husband or son again if she refused. Van Winkle then pushed her onto the couch, ripped her shirt off, and forced her to perform oral sex on him.

A week later, M.O. called Van Winkle's office to get another prescription. The next day, Van Winkle texted her, ostensibly to ask if she was in pain. A series of text messages between M.O. and Van Winkle then ensued while M.O. was at work. The content of these communications concerned Van Winkle's attempt to get a prescription to M.O. Eventually, they decided that Van Winkle would go to M.O.'s house early the next morning and leave a prescription for her in a Tupperware container on her front steps.

After M.O. got off work that night around midnight, she called her then-husband and spoke with him while she drove home. She was still speaking to her husband on the phone when she arrived home. She noticed that the light on her vent hood was off, although she always left it on when she went to work. As she turned the light on, she heard the bedroom door creak; she turned around and saw Van Winkle standing in front of her spare bedroom with a black pistol pointed at her. M.O. screamed. Van Winkle tackled her, wrestled her to the floor, and zip-tied her wrists behind her back. In the course of the scuffle, M.O. dropped her phone and the conversation with her husband was disconnected. Van Winkle pushed M.O. to her knees over an ottoman, but she was able to break the zip-ties and kick him "in the privates." Van Winkle pulled a screwdriver out of his pocket and hit her over the eye with it, telling her to be still if she ever wanted to see her little boy again. M.O. said that she would do whatever he wanted, and Van Winkle replied, "I know you will." He again threw

her on the ground, pinned her arms behind her and zip-tied them again, and placed a piece of duct tape over her mouth. He then pulled her to her feet and said they were "going to take a little walk."

As soon as the door was open, M.O. was able to break free, remove the duct tape from her mouth, and run to the house of her neighbors, the Pruitts. Christy Pruitt opened the door, and M.O. ran into the house with her hands still bound. She told Christy and her parents that Van Winkle was trying to kill her. Andrew Pruitt, Christy's father, said that M.O. was "screaming and bawling . . . [and] scared to death." Martha Pruitt, Christy's mother, called 911.

After the 911 dispatch, law enforcement became involved. Cove Township Constable Jim Corazzo headed to the location described in the dispatch. On his way, he saw a white pickup truck parked off of the road. Corazzo saw a man walking toward the vehicle and noticed that he was swinging a gun in his left hand. Corazzo ordered the man to the ground; after three commands, the man placed the gun on the hood of the truck and complied. Corazzo released the round from the gun and slid back the chamber, which caused a round to exit. Corazzo explained that, if the trigger of the gun had been pulled, the round would have been fired. Corazzo asked the man his name, and the man said it was David Van Winkle. Deputy Ronnie Richardson arrived on the scene soon after and placed Van Winkle in handcuffs. Richardson patted Van Winkle down and discovered a yellow-and-black screwdriver in his right back pocket and two pieces of white rope in his left back pocket.

After taking the appellant into custody, law enforcement began processing several locations for evidence. Officer Gene Hendrix was dispatched to the Pruitts' house, where he found M.O. with her hands still zip-tied together and her clothing in disarray. Hendrix cut the zip-ties off M.O.'s wrists and took photographs of her injuries.

Polk County Sheriff Mike Godfrey processed the crime scene at M.O.'s house. He observed that Van Winkle's truck had been parked "a couple hundred yards" from her house. Godfrey found two windows from which the screens had been removed, and there were pry or scratch marks on the front and rear doors. On one window, there were fresh, "really shiny" pry marks on the aluminum window sills, and the bottom trim was pried back as though a screwdriver or other prying instrument had been used to pop the window open. Inside that window, the drapes had been pulled out of place. Further inside the residence, there were signs of a scuffle, including an upended ottoman and pushed-up rugs. Sheriff Godfrey found M.O.'s phone under the couch and a plastic zip-tie on a living-room chair. He also discovered a roll of pennies wrapped in duct tape on the couch and a piece of duct tape in the yard. Sheriff Godfrey also obtained a search warrant for Van Winkle's house and truck. He retrieved a roll of duct tape and blood-stained paper towels from the house and a pair of zip-ties and a screwdriver from the truck.

On these facts, the jury returned with the guilty verdicts described above. On appeal, Van Winkle challenges the sufficiency of the evidence supporting four of those convictions: kidnapping, first-degree stalking, third-degree battery, and aggravated residential burglary.

III.  *Kidnapping*

A person commits the offense of kidnapping if, without consent, he restrains another person so as to interfere substantially with the person's liberty with the purpose of inflicting physical injury upon the other person; engaging in sexual intercourse, deviate sexual activity, or sexual contact with the other person; or terrorizing the other person. Ark. Code Ann. § 5-11-102(a)(4)–(6) (Repl. 2006); *White v. State*, 301 Ark. 74, 781 S.W.2d 478 (1989). Although Van Winkle concedes that there was sufficient evidence that he restrained M.O., he asserts that there was insufficient evidence of his intent or purpose in doing so. He suggests that the jury had to speculate or guess at why he restrained her.

There is no merit to Van Winkle's argument. The evidence was sufficient and did not leave the jury to guesswork or speculation. Van Winkle had previously coerced M.O. into having sex at his home. On the night of the kidnapping, the fact that he tied her hands behind her back and forced her to her knees over an ottoman gives rise to an inference that he intended to engage in sexual intercourse with her again.  The supreme court has held that the purpose of the restraint may be inferred from circumstantial evidence. *Green v. State*, 313 Ark. 87, 852 S.W.2d 110 (1993). Whether or not the assailant was able to complete the purpose of the kidnapping is irrelevant. *See Cook v. State*, 284 Ark. 333, 681 S.W.2d 378 (1984). Moreover, he came armed with a pistol and a screwdriver, and he threatened that she would never see her son again if she did not comply. Thus, there was also sufficient evidence of  an intent to terrorize her to support Van Winkle's kidnapping conviction.

SLIP OPINION

IV. *First-Degree Stalking*

A person commits the offense of stalking in the first degree if he

purposely engages in a course of conduct that harasses another person and makes a terroristic threat with the intent of placing that person in imminent fear of death or serious bodily injury or placing that person in imminent fear of the death or serious bodily injury of his or her immediate family and the person . . . is armed with a deadly weapon or represents by word or conduct that he or she is armed with a deadly weapon.

Ark. Code Ann. § 5-71-229(a)(1)(C) (Repl. 2005). A "course of conduct" means "a pattern of conduct composed of two (2) or more acts separated by at least thirty-six (36) hours, but occurring within one (1) year." Ark. Code Ann. § 5-71-229(d)(1)(A) (Repl. 2005). "Harassment" is defined in Arkansas Code Annotated section 5-71-208(a) (Repl. 2005):

A person commits that offense if, with purpose to harass, annoy, or alarm another person, without good cause, he or she:

(1) Strikes, shoves, kicks, or otherwise touches a person, subjects that person to offensive physical contact or attempts or threatens to do so; [or]

. . . .

(5) Engages in conduct or repeatedly commits an act that alarms or seriously annoys another person and that serves no legitimate purpose.

Van Winkle argues on appeal that there was no evidence that there was a "course of conduct" of harassment, contending that there was no evidence that he previously harassed M.O. or that he harassed her on the evening in question. The evidence, however, showed that, mere weeks before the incident in this case, Van Winkle forced her to engage in oral sex with him, threatening to tell her probation officer about her improper prescriptions if she did not. Van Winkle also threatened that she would never see her son again, both at the time of

the previous occurrence and on the night of the instant offense. From this evidence, the jury could conclude that Van Winkle had engaged in a course of conduct of harassment; as such, there is no merit to Van Winkle's argument on this issue.

## V. *Third-Degree Battery*

In his third point on appeal, Van Winkle asserts that there was insufficient evidence to prove that he committed the offense of third-degree battery on M.O.[1] A person commits battery in the third degree if, with the purpose of causing physical injury to another person, the person causes physical injury to any person. Ark. Code Ann. § 5-13-201(a)(1) (Repl. 2006). Van Winkle argues that, while M.O. initially testified that he hit her over the eye with a screwdriver, she conceded on cross-examination that she did not know whether the injury was the result of the blow from the screwdriver or from her fall to the floor. Therefore, he contends, the jury should not have found that he purposefully caused physical injury to M.O.

Van Winkle's argument is nothing more than a challenge to M.O.'s credibility. The credibility of witnesses, however, is an issue for the jury and not for this court. *Barrett v. State*, 354 Ark. 187, 119 S.W.3d 485 (2003). The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the victim's account of the facts rather than the defendant's. *Id.* Accordingly, Van Winkle's conviction for third-degree battery is supported by substantial evidence.

---

[1] As noted above, Van Winkle was charged with second-degree battery, but the jury convicted him of the lesser-included offense of third-degree battery.

SLIP OPINION

VI. *Aggravated Residential Burglary*

Finally, Van Winkle challenges his conviction for aggravated residential burglary. A person commits that offense if he commits the offense of residential burglary and is armed with a deadly weapon or represents by word or conduct that he or she is armed with a deadly weapon. Ark. Code Ann. § 5-39-204(a)(1) (Repl. 2006). A person commits residential burglary if he or she enters or remains unlawfully in a residential occupiable structure of another person with the purpose of committing in the residential occupiable structure any offense punishable by imprisonment. Ark. Code Ann. § 5-39-201(a)(1) (Repl. 2006).

At trial, Van Winkle moved for directed verdict as follows:

> Your Honor, with regard to Count II, aggravated residential burglary, the defense would state it believes the State has failed to provide any substantial evidence that Dr. Van Winkle did enter or remain unlawfully in the house of [M.O.] as described in this case. There is no evidence that he did so armed with a deadly weapon. In addition, there is no evidence that he represented by word or conduct that he had a deadly weapon.

On appeal, however, Van Winkle concedes that the evidence was sufficient to show that he entered M.O.'s residence unlawfully and that he was armed with a deadly weapon. He argues—for the first time on appeal—that there was no evidence of what he intended to do with or to M.O. This argument was not raised below and is therefore not preserved for appellate review. *Jackson v. State*, 2014 Ark. App. 415 (Parties cannot change the grounds for an objection on appeal, but are bound by the scope and nature of the objections and arguments presented at trial.) (citing *Tryon v. State*, 371 Ark. 25, 263 S.W.3d 475 (2007)).

Affirmed.

HIXSON and BROWN, JJ., agree.

*James Law Firm*, by: *William O. "Bill" James*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.