The trial in the matter was held on December 20, 2017.
H.M. testified that appellant is his great uncle-his mother's uncle-and that appellant lived with H.M. and his mother in "like, 2009" when he was nine years old. Everyone had their own rooms. The situation "just went downhill really fast, though." H.M. testified to appellant coming into H.M.'s room, turning off his radio, sitting on his bed, and talking to him. What happened next followed:
[Appellant] would start touching my penis, like, after, like, my underwear was around my ankles. When this happened I was laying down in my bed. [Appellant] would be like in the middle, slash, like the foot kind of [sic]. My mom was home but she was asleep. I know because I could hear her snoring. Me and mom's door- our rooms were next to each other.
[Appellant] would touch my penis with my clothes off. They were around my ankles. I would put them down because he told me to. When I say he, that is [appellant]. He would use his hand to touch me. His hand would slightly go up and down slowly. He didn't say anything to me when he would touch me. When he touched me he has [sic] his clothes on. This happened [one] time that I can remember. He told me not to tell nobody or he would hurt me and my mom.
H.M. also testified to "other things that [he] was not okay with" such as when appellant "put his hand on [H.M.'s] leg" or when appellant "put [H.M.'s] penis in [appellant's] mouth and he would, like, go up and down, kind of, too[.]" Appellant put his mouth on H.M.'s penis only once. H.M. stated that his clothes were around his ankles whenever appellant did these things and that appellant would threaten to hurt H.M. and his mother if H.M. told anyone. H.M. "didn't tell anybody about [appellant] coming into [his] room until [he] was in Vista Hospital. [He] didn't tell anyone because [he] was scared [appellant] would actually hurt [H.M.] and his mom" but he told at Vista Hospital (Vista) because he "felt safer." Vista is a mental hospital where H.M. received treatment in 2010. The first person H.M. told what had happened was his therapist at Vista. H.M. was ten at that time and "wasn't able to see this case through because [he] was scared of seeing appellant."
H.M. became aware of A.H. coming forward about allegations involving appellant in 2014, but he did not learn it from A.H. He did not talk to A.H. about what appellant did to him; "[t]hat wasn't something that was talked about a lot in [his] family." A.H. is the son of H.M.'s sister, Sheena Mendoza. H.M. and his sister lived with their mother, along with Sheena's children, among whom A.H. was included. When H.M. learned about A.H. coming forward, he felt that he "needed to do something[,] but [he] didn't know what to do." He eventually went back to the Children's Advocacy Center (CAC).[1]
*613 H.M. also testified that he did not remember telling a Vista counselor that appellant touched his penis with his mouth, then qualifying that "[he] remember[ed] saying it, but [he didn't] think it happened to be honest." He "[didn't] believe" he told CAC workers that appellant performed oral sex on him though he did tell the same to the prosecutors. However, H.M. testified to having a "bad memory" and that he was "not able to remember exactly what [he] said in 2010 or 2014[,]"[2] though H.M. unequivocally asserted that he remembered appellant touching H.M.'s penis with his hand and mouth in 2009. He "[did] not have any doubt" regarding those memories.
A.H. then testified. Appellant was someone A.H. would spend time with when A.H. went to his grandmother's house when he was in kindergarten. A.H. testified regarding his encounters with appellant that things happened to him that were "not okay with [A.H.]." Appellant would call A.H. over to appellant's lap, then appellant would "touch [A.H.'s] private part over [A.H.'s] clothes." Regarding the specifics, A.H. testified:
I said when I would sit on [appellant's] lap he would have a magazine. Like he would use, like, the magazine to, like, cover it up so that nobody would see it and then, like, just-I think, like, distract them or something, like, where nobody would notice him touching my private parts. When he touched my private parts he would use his hand. He was touching my penis. He touched me on top of my clothes. Sometimes there were other people in the room. They weren't able to see. They wouldn't see he was touching me because he was using a magazine, or, like, it was, like, a newspaper, sometimes a magazine. This happened a lot.... I never asked him to stop because I was, like, too young and I wasn't -- my brain wasn't, like, knowing, like, that's not good. I was in kindergarten and that young age. I didn't understand what was exactly happening.
I didn't tell anybody else about what [appellant] was doing at that time. I just didn't know, like, that it was, like, not good and not bad, but, like, it just wouldn't cross my mind.
A.H. did not disclose what happened to him until a couple years before the trial, after he learned about what appellant had done to H.M.; however, he and H.M. had not talked about what happened "in depth or in detail" as they "try to avoid" the topic. What appellant did "isn't something [his] family talks about very often." What appellant had done to A.H. "just came to him and [he] realized it." A.H. first told his grandmother, who then told A.H.'s mother, who spoke with A.H. when she arrived home from work. A.H. later talked to someone at the CAC. A.H. denied "[making] up this story so that [he] could get out of trouble" the night he first brought the allegations up.[3]
Cynthia McAfee-niece of appellant, mother to H.M., and grandmother to A.H.-confirmed that H.M. was nine when she and H.M. moved in with appellant. She was only in the home "about a month" before she moved out. During the time she lived with appellant, she noticed a difference in H.M.'s behavior, actually before they moved in, "probably three, four months, into [appellant] coming visiting *614 [sic]." She noticed that H.M. was leaving the house without telling her because "he was not wanting to come home."[4] H.M. begged her "several times" not to let appellant live with them; she thought H.M. did not like that there was going to be a father figure in the house. She learned that appellant had sexually abused H.M. from the 2010 investigation. She had not discussed the circumstances of what happened between appellant and H.M. with A.H.; she "[didn't] want to know."
Cynthia observed A.H. getting into appellant's lap while appellant was holding a book; she had seen A.H. get into appellant's lap and look through magazines. She had had "suspicions" of sexual abuse between appellant and A.H., but A.H. would deny that anything had happened and run off whenever she had asked him about it. However, she recalled a particular argument between her and A.H.:
He yelled at me one time and said-me and him had got into an argument and he said, "You'll never understand me, mom." I said, "Why?" He goes, "It's all because of [appellant]." I said, "Why? What do you mean [appellant]?" He goes, "It's just because of [appellant]," then he ran out the door and was gone for about three hours. The argument was over he didn't do his chores. He was supposed to do his chores before he went out to play and he hadn't done them, and I was trying to stop him from leaving.
Cynthia never discussed A.H.'s allegations with H.M. H.M. "was not able to see [his 2011] case [against appellant] through." He had been strong, but started shaking and said he "just [could] not do it" when he learned that appellant would be in the same room as him during the trial.
Sheena Mendoza, mother to A.H., testified that A.H. was six years old in 2009 depending on what time of year it was. At that time, her mother-Cynthia-would take care of her children, including A.H., while she worked. Appellant lived with Cynthia during that time. At the time H.M. disclosed his allegations against appellant, Sheena "wasn't aware of anything involving" A.H. She questioned A.H., but his answer was always no and she did not want to pressure him. She reasoned that "[A.H.] was young, maybe he didn't understand, and then [she] just let it go." But she would ask again a few months later.
Sheena's testimony confirmed how and to whom A.H. disclosed as well as his going to speak with someone at the CAC. It also confirmed Cynthia's testimony about how long Cynthia and H.M. lived with appellant. Sheena "honestly [had] told A.H. that [she didn't] personally want to hear all the details"; she "[does not] ask a lot of questions." The allegations H.M. made were "never a big topic" of discussion between Sheena and Cynthia "because [they] didn't want to talk about it." They never talked about the allegations around the children.
Detective Brian Hanna, with the Rogers Police Department, testified that he investigated the hotline report of A.H.'s allegations against appellant. A.H. was interviewed at the CAC, which is a "neutral environment" where children are "typically" taken; children are not interviewed by law enforcement. Hanna observed the interview on video. He formulated appellant as a suspect based on A.H.'s interview. Hanna interviewed Sheena separately from A.H., as well as H.M. In 2014, H.M. said he performed oral sex on appellant, *615 but not that appellant performed oral sex on H.M. During his investigation, he learned that Sheena had asked A.H. "repeatedly" about whether appellant had done anything to him-which he found to be normal-however, he asked her and Cynthia to refrain from talking to the kids about the allegations to "protect the integrity of the investigation[.]" Following Hanna's testimony, Torkleson testified virtually identically to his Rule 404(b) -hearing testimony.
After Torkleson's testimony, appellant moved for a directed verdict and dismissal of the charges against him. Regarding count one, sexual assault in the second degree, appellant argued that
[appellee had] not proven that [appellant] engaged in sexual conduct with A.H., who was less than 14 at the time of the alleged offense, and not his spouse. The only evidence presented has been the uncorroborated testimony of the alleged victim. The fact that he was living with [appellant] at the time of the alleged offense is only circumstantial, and the time frame is confusing because of his age at that time.
Regarding count two, appellant argued that
[appellee had] not proven that [appellant] engaged in deviate sexual behavior with H.M., who was less than 14 years of age at the time of the alleged offense. The only evidence presented has been his testimony; and, in fact, H.M. testified that he did not think that it happened and did not remember it happening when asked if [appellant] had touched him with his mouth.
The motion was denied. The appellant then testified.
Appellant stated that Cynthia was used to him "coming down on the weekends" and that he came down "all different days" once he retired, but asserted that "on average it was maybe every two months or so[,]" mainly for special occasions but "[a]ny excuse [he] could come up with to go down there and visit A.H." He denied talking to H.M. until he had made several trips down. He had not lived with children in his home since his divorce in 1979; however, he moved to Arkansas on April 1, 2009, and allowed Cynthia and H.M. to live with him. Sheena's children would be picked up by Cynthia and stay with her at appellant's home "between an hour or two hours" until Sheena got home from work. Sheena never came to the house; Cynthia always took the children to her.
Appellant testified to a litany of things he "never" did or which never occurred including: (1) he never ate dinner with Cynthia and the kids as a family, (2) he never sat in the living room with the children and watched TV; (3) A.H. "never sat in [his] lap after school"-that "never happened"; (4) he never babysat; and (5) he never allowed H.M. or A.H. to go in his bedroom to watch TV. He "absolutely, [he swore] to God he never touched A.H. on his penis" and that he did not keep magazines in his house because he "[didn't] believe in them" and was "totally against" them. He "absolutely [knew] of no reason" why A.H. would make his allegations up. There "wasn't ever a point that [he] went in H.M.'s room after Cynthia was in bed." Appellant stated that H.M. had "behavioral problems" when he moved in that Cynthia had told him about "from the first time [he] went down there." H.M. was already in counseling when appellant moved to Arkansas.
Regarding H.M.'s allegations, appellant testified, "[At] no point did I touch H.M. on the penis. Absolutely not on top of his clothes or under his clothes. As God as my witness I did not perform oral sex on him. I absolutely did not make H.M. perform oral sex on me." He further testified *616 "[d]uring the five to six weeks or even before that when H.M. and Cynthia lived with me I never touched H.M. on the penis. I never touched A.H. on the penis. I never had H.M. touch my penis. I never put my mouth on H.M.'s penis." He denied that there was "any falling out with" H.M. or his mother, Cynthia.[5] The "only reason" he could see was that H.M. was "mad over the waffle" and "was going to commit suicide because [Cynthia] told [H.M.] I made [H.M.] cut [the waffles] up so [H.M.] wouldn't be mad at [Cynthia]." He also referred to his making H.M. learn his multiplication tables as a reason H.M. would make up such allegations.
With regard to his encounter with Torkleson, appellant recalled the stop and "vaguely" recalled his "chat" with Torkleson. Appellant had been "pretty upset that day" because he "had just lost his family." He said that he was a lonely, gay man who thought he had found a new family, but he had not. Appellant testified that he was "experimenting" with a friend's suggestion during that stop since there were no "gay churches" as there had been in Kansas City and he was too old for the bars being in his sixties when he moved to Arkansas. He testified that he "didn't remember" making the statement that he was "sexually frustrated because [he missed] his boys." However, he immediately followed up by saying, "I do remember saying that about my boys, but when I was talking about my boys I was talking about I would be ashamed if they knew I was getting a ticket for this but none-had nothing to do with sexual arousal." His boys were currently in their forties but were two- and five-and a half years old when he last had any contact with them.
Following appellant's testimony, appellant rested his case. He then renewed his motion for directed verdict asserting that appellee failed to prove that appellant engaged in sexual conduct with A.H. on count one of sexual assault in the second degree and failed to prove that appellant engaged in deviate sexual behavior with H.M. on count two of rape. He specifically argued that H.M. "gave uncorroborated and inconsistent testimony and he, in fact, testified that he did not think it happened or it did not happen, or he didn't remember it happening that [appellant] had touched him with his mouth." The renewed motion was denied. The jury subsequently found appellant guilty as charged, sentencing him to twenty years' imprisonment on the charge of sexual assault in the second degree and thirty years' imprisonment on the charge of rape, to be served consecutively. The circuit court entered a sentencing order reflecting the same on January 5, 2018. This timely appeal followed.
This court treats a motion for directed verdict as a challenge to the sufficiency of the evidence.[6] In reviewing a challenge to the sufficiency of the evidence, we determine whether the verdict is supported by substantial evidence, direct or circumstantial.[7] Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion *617 or conjecture.[8] This court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered.[9] The credibility of witnesses is an issue for the jury and not the court.[10] The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence.[11]
Appellant's first argument on appeal is that appellee failed to prove that he committed sexual assault in the second degree against A.H. He argues that "it is not clear that [A.H.] stayed and was 'sitting' in [appellant's] lap ... [that] neither A.H. nor the grandmother's testimony is even consistent with lap sitting." He asserts that "there was no indication by any of the [appellee's] witnesses that a kindergartener sitting in a lap reading a book after school (the facts viewed in the most favorable light to the [appellee] ) is wrong or inappropriate." Accordingly, he argues that appellee failed to prove the sexual-gratification element of sexual assault in the second degree. This court does not agree.
Sexual assault in the second degree is committed when a person who is eighteen years of age or older engages in sexual contact with another person who is less than fourteen years old and not the person's spouse.[12] Sexual contact is defined as any act of sexual gratification involving the touching, directly or through clothing, of the sex organs, buttocks, or anus of a person or the breast of a female.[13] Sexual gratification is not defined by the statutory code, but the two words have been interpreted according to their plain meaning.[14]
Testimony revealed that A.H. was in kindergarten at the time of the occurrences with appellant, well below the fourteen-year-old threshold for the charged crime. It is undisputed that appellant was not married to A.H. A.H. testified that appellant (1) touched him through his clothes on multiple occasions-sometimes in the presence of others-by placing A.H. on appellant's lap and using a magazine to shield appellant's hand touching A.H.'s penis through A.H.'s clothes. A sexual-assault victim's testimony may constitute substantial evidence to sustain a conviction for sexual assault.[15] The victim's testimony need not be corroborated, and the victim's testimony alone, describing the sexual contact, is enough for a conviction.[16] In any case, Cynthia testified to seeing A.H. sitting on appellant's lap. The credibility of witnesses is a matter for the jury's consideration.[17] Even where the defendant denies the allegations, the credibility and weight of the evidence are issues properly left to the fact-finder.[18] The jury may *618 resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the victim's account of the facts rather than the defendant's.[19] It is clear that the jury chose to believe A.H. and Cynthia; however, A.H.'s testimony was substantial evidence to support the conviction by itself.
Appellant's second argument is that appellee did not prove that he committed rape against H.M. While acknowledging that the uncorroborated testimony of a rape victim that shows penetration is sufficient evidence for a conviction, appellant argues that H.M.'s testimony is not sufficient to support a finding of penetration.
A person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person who is less than fourteen years of age.[20] "Deviate sexual activity" is defined, in pertinent part, as any act of sexual gratification involving the penetration, however slight, of the anus or mouth of a person by the penis of another person.[21]
H.M. testified that appellant's mouth was on H.M.'s penis and that he would "go up and down" and that he placed his hand on H.M.'s penis and that "his hand would slightly go up and down slowly." The uncorroborated testimony of a child-rape victim is sufficient evidence to sustain a conviction.[22] In Lowe v. State , this court held that "[i]t did not require speculation for the trial court to conclude that some portion of each person's penis entered the other person's mouth to at least some minimal degree" where a child victim testified that he and the appellant had placed their mouths on each other's penises.[23] This court does not agree with appellant's thinly veiled argument that, essentially, he cannot be convicted of rape because he was penetrated (in the mouth) and not the victim. Furthermore, to the extent that appellant makes an argument regarding the consistency of H.M.'s testimony, any inconsistencies in H.M.'s testimony were for the jury to resolve; it is not an issue for the appellate court.[24]
Appellant's third argument is that it was reversible error for the circuit court to admit the testimony of Nick Torkleson. Appellant argues that the evidence was not admissible because (1) it was bad character evidence; (2) the pedophile exception does not apply; (3) there was no "other purpose" for which the evidence could be used; (4) the evidence was not independently relevant pursuant to Rule 403; alternatively, (5) the evidence was more prejudicial than probative; and (6) inclusion of the evidence was not harmless error.
Pursuant to Arkansas Rule of Evidence 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."[25] Such evidence is permissible for *619 other purposes, however, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[26] Under Arkansas Rule of Evidence 404(b), evidence of other crimes will be admitted if it has independent relevance, and its relevance is not substantially outweighed by the danger of unfair prejudice.[27] Evidence is independently relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.[28]
Rule 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[29] Evidence offered by the State is often likely to be prejudicial to the accused, but the evidence should not be excluded unless the accused can show that it lacks probative value in view of the risk of unfair prejudice.[30]
The admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the circuit court, and we will not reverse absent a showing of manifest abuse of discretion.[31] Additionally, prejudice must have resulted.[32] Likewise, the balancing mandated by Rule 403 is also a matter left to a circuit court's sound discretion, and an appellate court will not reverse the circuit court's ruling absent a showing of manifest abuse.[33] Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration.[34]
This court addresses together appellant's first, third, and fourth sub-arguments-that Torkleson's testimony was bad character evidence, there was no "other purpose" for which the evidence could be used, and the evidence was not independently relevant pursuant to Rule 403, respectively. The circuit court admitted the evidence on the very limited finding that the statement was "sufficiently similar" to "show sexual proclivity towards missing or towards boys and sexual frustration by not being around them." It made no reference in its ruling to appellant's sexuality or method of attracting partners. The circuit court even excluded any evidence of the outcome of the September 28, 2009 encounter. We cannot hold *620 that the circuit court admitted the evidence as bad character evidence.
Secondly, the timing of the statement aligned with the timing of appellant's sexual encounters with A.H. and H.M., and the jury could have found it to form the basis for a purpose other than conformity with bad character, such as intent or proof of motive or intent to sexually assault and/or rape young boys. Finally, because appellant's statement referenced sexual frustration involving boys at a time when other testimony revealed that he was having sexual encounters with little boys, the statement was independently relevant. No error occurred.
Appellant's second argument is that the pedophile exception does not apply as said exception "has not been expanded to include evidence of a defendant's similar acts with an adult." This argument misunderstands the circuit court's ruling for it did not admit appellant's statement to Torkleson because he was driving while masturbating to pick up consenting adult men, but solely because appellant voluntarily made a statement linking his sexual frustrations with being unable to see boys.
The "pedophile exception" to Rule 404(b) allows evidence of prior sexual conduct with children to show the defendant's proclivity for a specific act with a person and helps show the depraved sexual instinct of the accused.[35] Under the pedophile exception, we look at factors such as the time interval between the incidents, the similarity of the incidents, and whether the defendant had an intimate relationship with the victim.[36] There are two requirements for this exception to apply: (1) a sufficient degree of similarity between the evidence to be introduced and the charged sexual conduct, and (2) evidence of an "intimate relationship" between the defendant and the victim of the prior act.[37] The "intimate relationship" requirement can be satisfied when a defendant lives in the same home as the victim or otherwise has access to the victim.[38] Additionally, evidence admitted under Rule 404(b) must be temporally proximate, and we apply a reasonableness standard to determine whether a prior crime remains relevant despite the passage of time.[39]
The admitted statement was made by appellant, of his own volition, in 2009, which was around the same time he began his sexual encounters with A.H. and H.M., according to their testimony. His stated sexual frustration stemmed from not seeing his "boys," a term which appellant testified he used to refer to his own sons with whom he had a close relationship prior to his divorce from their mother. When he last encountered his "boys", they were "little" with one son being five and a half years old when he last saw him, around the same age as A.H. when appellant began assaulting him. While the circuit court did not expressly state that it was ruling for appellee under the pedophile exception, its reference to appellant's sexual proclivity as the basis for admitting *621 the evidence demonstrates that it ruled pursuant to said exception. This court holds that there was no abuse of discretion; we find no error.
Appellant's final arguments are that the evidence was more prejudicial than probative and that inclusion of the evidence was not harmless error. Appellant cites this court to Purdie v. State[40] and Cox v. State[41] for the premise that an expert witness's testimony cannot be allowed to determine whether a victim is telling the truth in his or her testimony. He then goes on to admit that this case "does not necessarily turn on a credibility assessment by a witness" but argues that because H.M.'s testimony was inconsistent, Torkleson's testimony that appellant's 2009 statement was a "red flag" was "essentially saying that [appellant's] statements equal a child molester." He further asserts that, like in Purdie and Cox , the evidence against appellant was not "overwhelming" where the only evidence was the testimony of the respective victims so that the circuit court's admission of the statement was not harmless error. We cannot agree.
Beyond the victims' testimony was appellant's own testimony, which at best, could be seen as not helpful to his case. The fact-finder need not lay aside its common sense in evaluating the ordinary affairs of life and may consider and give weight to any false, improbable, and contradictory statements made by the defendant to explain suspicious circumstances when determining criminal knowledge and intent.[42] Additionally, there was testimony from other witnesses that they had seen A.H. on appellant's lap behind a magazine on at least one occasion-as testified to by A.H. and contrary to appellant's testimony-and that H.M.'s behavior issues increased around the time appellant entered his life and H.M. had stopped wanting to come home once he was living with appellant. If any error had occurred, and we find that it did not, we would hold that it was harmless.
Affirmed.
Gruber, C.J., and Hixson, J., agree.

H.M. had gone to the CAC after he first reported his encounters with appellant to his therapist in 2010.

He also testified that he lied to the people at Vista to "try to get them to do what [he] wanted" after speaking of a lie he told about hearing voices in an attempt to get released from Vista, which led to a longer stay.

A.H. was in the middle of an argument with his grandmother when he first told what happened between him and appellant.

Appellant had been visiting regularly-"every other weekend"-before he, Cynthia, and H.M. moved in together.

In his testimony, appellant references A.H. and Sheena in these statements. However, he meant H.M. and Cynthia based on his immediately following statement regarding the waffle incident. All witness testimony involving the waffle incident, no matter the witness, made it clear that H.M. was involved in the waffle incident, not A.H., and Cynthia is H.M.'s mother, not Sheena. Appellant later testified that this reason referred to H.M. and not A.H.

Thompson v. State , 2015 Ark. App. 275, at 4, 461 S.W.3d 368, 372 (citing Tubbs v. State , 370 Ark. 47, 257 S.W.3d 47 (2007) ).

Id.

Id.

Id. at 4-5, 461 S.W.3d at 372.

Id. at 5, 461 S.W.3d at 372 (citing Morgan v. State , 2009 Ark. 257, 308 S.W.3d 147 ).

Id.

Gilton v. State , 2018 Ark. App. 486, at 5, 562 S.W.3d 257, 260 (citing Ark. Code Ann. § 5-14-125(a)(3) (Supp. 2017) ).

Id. (citing Ark. Code Ann. § 5-14-101(11) ).

Id. (citing Brown v. State , 374 Ark. 341, 288 S.W.3d 226 (2008) ).

Echoles v. State , 2017 Ark. App. 352, at 5, 524 S.W.3d 417, 420 (citing Brown v. State , 374 Ark. 341, 288 S.W.3d 226 (2008) ).

Id. (citing Colburn v. State , 2010 Ark. App. 587, 2010 WL 3582441 ).

Id. (citing Tryon v. State , 371 Ark. 25, 263 S.W.3d 475 (2007) ).

Id. at 5-6, 524 S.W.3d at 420 (citing Estrada v. State , 2011 Ark. 3, 376 S.W.3d 395 ).

Id. at 5, 524 S.W.3d at 420 (citing Van Winkle v. State , 2014 Ark. App. 591, 445 S.W.3d 542 ).

McPherson v. State , 2017 Ark. App. 515, at 4, 532 S.W.3d 96, 100 (citing Ark. Code Ann. § 5-1-103(a)(3) (Repl. 2013) ).

Id. (citing Ark. Code Ann. § 5-14-101(1) ).

Lowe v. State , 2016 Ark. App. 389, at 3, 500 S.W.3d 176, 178 (citing Matar v. State , 2016 Ark. App. 243, 492 S.W.3d 106 ).

Id. , at 5, 500 S.W.3d at 179.

Wiseman v. State , 2017 Ark. App. 371, at 5, 526 S.W.3d 4, 7 (citing Allen v. State , 2016 Ark. App. 537, 506 S.W.3d 278 ).

McDaniel v. State , 2018 Ark. App. 151, at 5, 544 S.W.3d 115, 118.

Id.

Id. at 5-6, 544 S.W.3d at 118 (citing Jones v. State , 349 Ark. 331, 339, 78 S.W.3d 104, 110 (2002) ).

Id. at 6, 544 S.W.3d at 118 (citing Cluck v. State , 365 Ark. 166, 175, 226 S.W.3d 780, 786 (2006) ).

McPherson v. State , 2017 Ark. App. 515, at 6, 532 S.W.3d 96, 101.

Dolson v. State , 2018 Ark. App. 440, at 7, 558 S.W.3d 899, 903 (citing Chunestudy v. State , 2012 Ark. 222, 408 S.W.3d 55 ).

Id. (quoting Turner v. State , 2018 Ark. App. 5, at 13-14, 538 S.W.3d 227, 238 (citing Dimas-Martinez v. State , 2011 Ark. 515, 385 S.W.3d 238 ) ).

Rayburn v. State , 2018 Ark. App. 84, at 3, 542 S.W.3d 882, 884 (citing Turner v. State , 2014 Ark. App. 428, 439 S.W.3d 88 ).

Dolson , 2018 Ark. App. 440, at 7, 558 S.W.3d at 903-04 (quoting Turner , supra (citing Croy v. State , 2011 Ark. 284, 383 S.W.3d 367 ) ).

Id. at 7, 558 S.W.3d at 904 (quoting Turner , supra (citing Lard v. State , 2014 Ark. 1, 431 S.W.3d 249 ; Craigg v. State , 2012 Ark. 387, 424 S.W.3d 264 ) ).

Rayburn v. State , 2018 Ark. App. 84, at 3, 542 S.W.3d 882, 884 (citing Chunestudy v. State , 2012 Ark. 222, 408 S.W.3d 55 ).

Id. (citing Parish v. State , 357 Ark. 260, 163 S.W.3d 843 (2004) ).

Hortenberry v. State , 2017 Ark. 261, at 10, 526 S.W.3d 840, 847 (citing Rohrbach v. State , 374 Ark. 271, 287 S.W.3d 590 (2008) ).

Henington v. State , 2010 Ark. App. 619, at 7, 378 S.W.3d 196, 200 (citing Kelley v. State , 2009 Ark. 389, at 10, 327 S.W.3d 373, 379 ).

Woods v. State , 2013 Ark. App. 739, at 7, 431 S.W.3d 343, 348 (citing Craigg v. State , 2012 Ark. 387, at 6, 424 S.W.3d 264, 268 ).

2010 Ark. App. 658, 379 S.W.3d 541.

93 Ark. App. 419, 220 S.W.3d 231 (2005).

Worsham v. State , 2017 Ark. App. 702, at 7, 537 S.W.3d 789, 794 (citing Hoodenpyle v. State , 2013 Ark. App. 375, at 9, 428 S.W.3d at 552-53 (citing Hicks v. State , 2012 Ark. App. 667, 2012 WL 5949103 ) ).