2011 Ark. App. 169

**Pamela HENRY, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 10–1099.**

Court of Appeals of Arkansas.

March 2, 2011.

Paul Alexander Petty, Searcy, for appellant.

Laura Shue, Little Rock, for appellee.

RITA W. GRUBER, Judge.

Pamela Henry appeals her conviction in a bench trial for fourth-offense driving while intoxicated. The charges resulted from an automobile accident that occurred about 7:00 a.m. on July 15, 2009, at a four-way-stop intersection of state Highways 167 and 303. Henry does not dispute that she broadsided a Jeep after failing to stop, that she had been taking prescribed medicines, and that her urinalysis was positive for barbiturates. She contends that 1) there was not sufficient evidence to prove she was under the influence of a controlled substance, and 2) the trial court erred by allowing the State to present proof of prior convictions after it rested its case-in-chief.

### Sufficiency of the Evidence

It is unlawful and punishable "for any person who is intoxicated to operate or be in actual physical control of a motor vehicle." Ark.Code Ann. § 5–65–103(a) (Repl. 2005). For purposes of the offense, "intoxicated" means

influenced or affected by the ingestion of alcohol, a controlled substance, any intoxicant, or any combination of alcohol, a controlled substance, or an intoxicant, to such a degree that the driver's reactions, motor skills, [and] judgment are substantially altered and the driver, therefore, constitutes a clear and substantial danger of physical injury or

death to himself and other motorists or pedestrians.

Ark.Code Ann. § 5–65–102(2) (Repl.2005).

The State's witnesses at trial included Casey Horn, the driver of the Jeep; Chief John Staley and Officer Todd Baldwin of the Austin Police Department; and Leanne Hazard, a toxicologist at the Arkansas State Crime Lab and an expert in forensic toxicology. Horn, Staley, and Baldwin testified about the intersection, the accident, and subsequent events.

Horn testified that "plenty" of signs clearly marked the intersection, and that the approach eastbound from the freeway had ridges to "make a racket" and "jar you." She made a full stop and proceeded southbound into the intersection. Henry's car struck hers on its passenger side, knocking it sideways and totaling it. When Horn got out to check on her son in the back seat, she saw Henry standing beside her own damaged car. They had no conversation.

Chief John Staley testified that on Henry's eastbound approach were rumble strips and two large yellow signs. He said, "They're the large yellow signs and they have stop signs imprinted on [them] with arrows pointing up, indicating a stop ahead." He said that the "top sign" was "a large stop sign" that could be seen a block away. Henry was standing outside a wrecked Ford when he arrived at the intersection. She appeared to be "very relaxed," which he did not find normal for someone recently in a car accident; she held a large mug of what she said was Diet Coke; and her speech was slightly slurred. He asked if she needed medical attention or was injured, and he checked for a head injury that might have been consistent with her symptoms. Her pupils looked "fine," he saw no "knot," and she was coherent, but he had to get her out of the road and intersection. She followed his directions once to stay on the sidewalk, but he decided to stay with her after she again walked toward her car.

Henry was shaking but said that she was not injured, did not need an ambulance, and did not feel that anything was wrong. She did not follow Staley's directions for a horizontal-gaze nystagmus test, again seeming to be extremely relaxed for the situation, and she said that she would not complete any more sobriety tests. He then asked her to recite her ABCs; she slurred them and he could not understand letters she ran together. Staley learned from a license check that Henry had other DWIs and a suspended license. He placed her into custody, took her belongings, and made an inventory search of her purse. There were four pill bottles in her name—Soma, Klonopin, Flexeril, and Primidone. All had been filled several days before the accident, and Henry told him that she took the medicines daily. She said that she had missed her normal work exit and did not see the stop sign in the unfamiliar area. Under her written statement, "Turned off interstate & Highway 305 & 367 intersection— stop sign and then accident," she did not mark any contributing factors such as "result of any ... medical condition."

Officer Baldwin testified that he made sure no one needed paramedics when he arrived at the scene of the accident. Both drivers told him that they were "fine" and not in need of help. He talked to Henry and observed that

she seemed very confused, like she just wasn't there. She wasn't moving very fast. It was just like she didn't care that anything had happened. Her speech was slurred a little bit. She almost seemed like she was intoxicated but there was no odor of intoxicant.

He read her a rights form, which she initialed and signed, and transported her to Cabot for a breath-alcohol-content test and urinalysis. She indicated on her rights form that she did not want additional tests at her own expense. The BAC produced a "zero" reading, a result that Baldwin expected; he testified that the test was routinely done to rule out alcohol when drugs were suspected in DWIs. He recalled that labels on several of Henry's pill bottles warned against driving.

Toxicologist Leanne Hazard testified that her qualitative drug screen of Henry's urine was positive for barbiturates, a result that Primidone could produce. She said that results were negative for benzodiazepines such as Klonopin; that Flexeril and Soma, a sleep aid and muscle relaxer, would not show up in the screen; and that other drugs could have been present without reacting to the screen. She said that possible side effects of Primidone were dizziness, light-headedness, drowsiness, and vertigo. Hazard explained that only a blood test could quantitate an amount of drugs in a person's system, that any level of drugs could be impairing, and that even therapeutic amounts of medications had potential side effects.

The State rested. Henry moved to dismiss, arguing that the mere presence of barbiturates was insufficient evidence of operating a vehicle while impaired. The motion was denied.

Henry and her ex-husband, Richard, testified for the defense. Richard testified that she had already gone to Cabot when he talked to Chief Staley, who said he believed she was drunk because she was too calm, he would "get her," and computer records showed that this was not her first occurrence. Richard affirmed that it was not and told Staley it was something the couple often fought about. When Officer Baldwin and Pamela returned, Richard noticed that she slurred her speech, was unsteady and lethargic, and had a two-and-a-half-inch knot on her head. As a licensed practical nurse who had treated head injuries after automobile accidents, he was not convinced that she was intoxicated. When he asked about calling an ambulance, Staley told him there was no need because "she's drunk." Richard said that Primidone stopped her hand tremors without affecting her speech or physical movements; that her drugs never affected her actions or functions, such as driving; and that her symptoms of unsteadiness, dilated eyes, and slurring indicated a concussion. He said that the Ford was his car, and only after the accident did it have a broken windshield.

Pamela Henry testified that she felt the rumble strips, slowed down, did not see the stop sign against the sunlight, and hit the deployed air bag. Formerly a registered nurse, she opined that shock was the cause of her behavior and calmness that followed the accident. She said a knot had appeared on her head and she had slept for twenty hours, a "sure sign" of concussion. She said she had not taken Flexeril or Soma that day, the urinalysis would have detected Klonopin had she taken it, and her only daily medication was Primidone. She said that she took Primidone at night because it made her sleepy but that it had no side effects during the day. She denied saying that she took all the medicines daily and denied being asked if she wanted to go to the hospital.

The defense rested, and Henry renewed her previous motion to dismiss. She made an additional argument that there was no proof of previous convictions, a necessary element of fourth-offense DWI, and asked the court to decide the case as first-offense DWI. The State responded that it had not wanted to prejudice Henry but it was prepared, should she be found guilty, to pro-

vide evidence of the convictions in the later sentencing portion of the "bifurcated hearing." The State argued that there was sufficient evidence of the elements of DWI. The court denied Henry's motion.

Henry objected that this was not a bifurcated situation; again, she asserted that the State had been obligated to prove previous convictions as an element of fourth-offense DWI. The court ruled that "DWI felony offenses are bifurcated by nature." The court found it appropriate that the State present evidence on the underlying charge in phase one and then, should the court find that the State had met its burden, present proof of prior convictions in phase two. The court announced that phase two had not yet begun, and the parties made their closing arguments on proof of intoxication and impairment due to a controlled |₇substance. Finding that "all of the evidence" had been received on "the underlying charge," the court pronounced Henry guilty of operating a motor vehicle while intoxicated.

The court then asked, "Are we ready at this point to go into evidence for purposes of dispositions?" The State responded affirmatively, and it offered proof of three relevant DWI convictions. Henry objected that the State was being given a second chance to introduce the proof, again because they were properly an element of the initial charge. The court admitted the evidence over her objection, found from the proof that she had three previous DWIs, and pronounced her guilty of fourth-offense DWI. He sentenced her to three years' imprisonment and two years' suspended imposition of sentence. Her request for an immediate appeal bond was refused, and transportation for her incarceration was arranged.

*Sufficiency of Evidence of Intoxication*

■ A motion to dismiss at a bench trial, like a motion for directed verdict at a jury trial, is considered a challenge to the sufficiency of the evidence. *Stewart v. State,* 2010 Ark. App. 9, 373 S.W.3d 387. When the sufficiency of the evidence is challenged in a criminal conviction, we review the evidence in the light most favorable to the State and affirm if the verdict is supported by substantial evidence. *Id.* Substantial evidence is evidence that induces the mind to go beyond mere suspicion or conjecture, and that is of sufficient force and character to compel a conclusion one way or the other with reasonable certainty. *Id.*

Henry contends in her first point that the State did not present sufficient evidence of intoxication. She notes that her drug screen was qualitative rather than quantitative, and she |₈notes the toxicologist's testimony that the positive barbiturates test showed presence of drugs but could not prove impairment.

■ Opinion testimony regarding intoxication is admissible, and it is the fact-finder's province to determine its weight and credibility. *See Johnson v. State,* 337 Ark. 196, 987 S.W.2d 694 (1999) (stating that officers' testimony about smell of alcohol and actions consistent with intoxication can constitute evidence of DWI). In *Robinson v. State,* 98 Ark.App. 237, 254 S.W.3d 750 (2007), we found insufficient evidence of intoxication from an automobile accident and positive drug screen alone: police officers did not believe the appellant to be intoxicated after the accident, there was no drug paraphernalia in her car, co-workers observed no behavior beforehand indicating the influence of drugs or intoxicants, and toxicologists could not say that test results proved she was intoxicated.

■ Henry requests us to rule that when officers suspect intoxication as a re-

sult of ingestion of a controlled substance, the State must present both "a quantitative analysis of the controlled substance in the blood stream" and expert testimony that "the quantity was sufficient to cause impairment." We decline the invitation. Here, there was evidence of Henry's possession of four bottles of controlled substances, with the potential to cause substantial impairment; her statement to Chief Staley that she took the medicines daily, and her own acknowledgment of taking Primidone at night; officer's opinion that she was intoxicated; and testimony of several witnesses about her substantial impairment immediately after the accident. This evidence, in conjunction with her positive drug screen and the facts of the accident, constitutes substantial evidence to support the fact-finder's conclusion that Henry was intoxicated.

### Proof of Prior Convictions

Henry contends that the trial court erred as a matter of law by allowing the State to present proof of her prior convictions after resting its case-in-chief in her bench trial. She notes the provision of Arkansas Code Annotated § 5–4–103(a) (Repl.2006) that "[i]f a defendant is charged with a felony and is found guilty of an offense *by a jury,* the jury shall fix punishment in a separate proceeding...." (Emphasis added.) The State responds that no error occurred. It argues that the trial court, by allowing this proceeding, essentially allowed the State to reopen its case for the purpose of introducing the omitted proof of prior convictions.

A motion for a directed verdict allows the trial court the option of granting it or allowing the prosecution to reopen its case to supply the missing proof. *McClina v. State,* 354 Ark. 384, 123 S.W.3d 883 (2003). The trial court's power to permit the State to reopen its case after parties have rested is discretionary, and the decision to reopen will not be reversed absent an abuse of that discretion. *Holloway v. State,* 312 Ark. 306, 849 S.W.2d 473 (1993). The reasoning behind this rule is to permit omitted or overlooked evidence to be presented to the fact-finder before it reaches a decision, when the defendant is not surprised by its introduction or otherwise prejudiced or placed at a disadvantage that cannot be overcome. *Id.*

Prior DWI convictions are elements of a felony fourth-offense DWI. *State v. Sola,* 354 Ark. 76, 118 S.W.3d 95 (2003) (citing Ark.Code Ann. § 5–65–111(b)(3)). Such a proceeding should be bifurcated in felony DWI cases before a jury, separating the guilt or innocence stage from the sentencing stage, in order to protect a defendant from prejudice by preventing the jury from considering prior convictions during the initial determination of guilt or innocence. *Id.*

Henry made her sufficiency argument regarding missing proof of previous convictions at the conclusion of her own case, not at the conclusion of the State's evidence. Although she argued that the proof should not be admitted in a later phase of trial, she neither challenged its facial validity nor asserted that she was prejudiced by its presentation. Under these circumstances, she cannot demonstrate that she was surprised or otherwise disadvantaged by the court's use of this so-called bifurcated procedure in her bench trial. The trial court essentially allowed the State to reopen its case to supply the missing evidence. It was within the court's power to do so, and we find no abuse of discretion.

Affirmed.

PITTMAN and ROBBINS, JJ., agree.