Cite as 2020 Ark. App. 419

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR–19–795

| | |
|---|---|
| CHRISTOPHER SHANE DILLARD<br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | **Opinion Delivered:** September 23, 2020<br><br>APPEAL FROM THE CLAY COUNTY CIRCUIT COURT, WESTERN DISTRICT<br>[NO. 11CCR-16-89]<br><br>HONORABLE CINDY THYER, JUDGE<br><br>AFFIRMED |

## BART F. VIRDEN, Judge

Christopher Shane Dillard appeals his conviction by a Clay County Circuit Court jury of one count of rape. We affirm.

### I. *Relevant Facts*

On June 24, 2019, the court held a pretrial hearing to address Dillard's motion to exclude testimony regarding sexually explicit text messages between Dillard and Kay Little. The messages involved Dillard's sexual fantasies involving his stepdaughters, A.L. (DOB 04/09/02) and A.L.G. (DOB 04/28/05). Dillard asserted that any testimony about the content of those text messages would be more prejudicial than probative, and the texts were inadmissible as evidence of other crimes or wrongs to show a prior bad act. The court denied the motion finding that Little's testimony was more probative than prejudicial and that the testimony fit within the "pedophile exception" to Arkansas Rule of Evidence 404(b).

The jury trial took place the next day. At the trial, Allen Earnhart, a former employee of the Arkansas State Police, testified that in July 2011, he received a call from the Paragould Police Department about Dillard's suspected abuse of a child. An investigator from the Crimes Against Children Division ("CADC") interviewed A.L., and Earnhart took a statement from Amber Risner, the children's mother and Dillard's wife. Earnhart also interviewed Dillard, who admitted that he and Little, Risner's ex-stepmother, were friends and were "sexting." During the 2011 interview, Dillard told Earnhart they had discussed fantasies of having family orgies involving A.L. and A.L.G. Earnhart testified that he did not know where the texts were and that he had never seen them. Earnhart explained that after having spoken to Risner and Dillard and after the CACD had interviewed A.L., the investigators did not believe there was a reason to further investigate the claim, and the case was closed.

Little testified that in 2011, she and Dillard were having an affair while he was married to Risner and living with Risner, A.L.G., A.L., and their infant son, E.D. During the affair, Dillard sent Risner sexually explicit text messages that "alarmed" her and made her fear that A.L.G and A.L. could be in danger. In the messages, he described wanting to have "family orgies" with A.L.G and A.L. and to "teach them oral sex." Within a week of receiving the explicit text messages, Little contacted a friend who worked at the Paragould Police Department to relay her concern. Dillard objected to Little's testimony asserting that the best-evidence rule required that the original text messages be produced. The State responded that the best-evidence rule did not exclude the testimony because the original

2

texts were lost. Moreover, the State explained, Earnhart already testified about the content of the texts. The court overruled the objection.

Kaye Beall, an investigator with the CACD, testified that she interviewed A.L. in 2011. The interview lasted about forty-five minutes, and A.L. stated that "she couldn't remember." Beall explained that investigators are trained not to supply information to a child and that they are trained "to not lead the children in to saying something."

Risner testified that the family moved to Corning in June 2011. She testified that she attended class during the day, and often Dillard took care of the children. In July 2011, she received a phone call from the police, and at that time, Dillard admitted to Risner that he had an affair with Little, that he was addicted to pornography, "and that was pretty much all that was said at that point." Risner recalled seeing bruises on A.L. around this time, but A.L. gave a reasonable explanation for them, and Risner believed her. Risner testified that someone from the CACD interviewed A.L., and A.L. denied any abuse. In December, Dillard moved out of the home, and in March 2012, they divorced. In the summer of 2015 after attending a church camp, A.L. "said something" to Risner, and as a result of what A.L. said to her, Risner called the police. In September, after another conversation with A.L., Risner called the child-abuse hotline. A.L. was hospitalized at BridgeWay for a week, and Risner stated that around that time A.L. cried frequently, she was not sleeping well, and she was having nightmares. A.L. continued therapy after her hospitalization. Risner testified that A.L. had been in therapy for ADHD since she was very little, but she had difficulty remembering if A.L. was in therapy in August 2011.

A.L., who was seventeen years old at the time of the trial, testified that Dillard began sexually abusing her when she was eight or nine years old. A.L. described multiple incidents of abuse. The first time it happened, A.L. was outside playing dolls with a friend. Dillard told her to come inside because he had "another game for [her] to play." Dillard led her to his bedroom and removed her "Hello Kitty dress." A.L. testified that she was "confused," but Dillard told her they were about to play a "big girl game" and that she "needed to trust him." Dillard removed his pants and told A.L. to get on her knees. He put his penis in her mouth. A.L. testified that she started "choking and gagging and trying to pull away," but Dillard pulled her hair and moved her head until he ejaculated and made her "swallow it." Then, Dillard told A.L. to lie on her stomach on the bed. A.L. stated that "all [she] remember[ed] after that [was] pain and blood." Dillard anally raped A.L. as she cried. He told her that if she told anyone he would kill her. Another time, Dillard made A.L. perform oral sex on him while he called her degrading names. Once, A.L. was sitting on her bed reading a book, and Dillard entered the room with his belt unbuckled and told her, "You know what you have to do." A.L. testified that by this time, she had learned "not to struggle, not to fight back," so she "opened [her] mouth and [she] let him do whatever he wanted." A.L. testified that another time Dillard took her to his bedroom, "pushed up her dress," "put his hand over [her] mouth," and "raped [her]." A.L. also described an incident in which Dillard and another man "took turns using [her]." A.L. testified that Dillard hit her "over and over" and "kicked [her] in the ribs." He threatened to kill her if she told anyone about the abuse, and when her mother asked her about the bruises, A.L. told her she had fallen off the monkey bars. A.L. stated that in June 2015, the family moved to Piggott, and

4

she attended church camp. At church camp, A.L. disclosed to a friend and a camp counselor that Dillard had hurt her. A.L. explained that in 2011, when she was first questioned about the allegations of abuse, she could not remember the incident because she was traumatized and had forgotten things and that she had been too afraid to go into detail. A.L. testified that she felt safer in 2015 because Dillard lived in Paragould, and she knew that she "wouldn't see him walking down the street, and I knew that he couldn't get me as easily."

Dillard moved for a directed verdict, arguing that there was no physical or medical evidence of any crime and that Dillard had not been identified as the person who committed the crimes. The State responded that "he's been named by all three names by each witness that has testified specifically, and directed as the ex-husband, stepfather[.]" The court denied the motion but allowed the State to reopen its case and call A.L. to the stand to identify Dillard. A.L. took the stand and pointed to Dillard stating that he was wearing a blue shirt and that he was the man who had raped her. Dillard renewed his directed-verdict motions, which the court denied. The jury found Dillard guilty of one count of rape and sentenced him to forty years' imprisonment in the Arkansas Department of Correction. This appeal follows.

II. *Discussion*

A. Admission of Testimony Regarding 2011 Text Messages

1. *The pedophile exception*

On appeal, Dillard raises several issues regarding Little's testimony regarding his 2011 text messages. For his first point on appeal, Dillard asserts that the circuit court erred in allowing Little's testimony about the text exchange because the testimony is not evidence

5

of prior sexual conduct with children; thus, the testimony does not fit within the pedophile exception. Dillard's argument is not well taken.

Arkansas Rule of Evidence 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have long recognized a "pedophile exception," which allows proof of "similar acts with the same child or other children in the same household when it is helpful in showing a proclivity toward a specific act with a person or class of persons with whom the accused has an intimate relationship." *Bobo v. State*, 102 Ark. App. 329, 333, 285 S.W.3d 270, 274 (2008). Such evidence not only helps to prove the depraved sexual instinct of the accused but is also admissible to show the familiarity of the parties and antecedent conduct toward one another and to corroborate the testimony of the victim. *Id.* The admission or rejection of evidence under Rule 404(b) is left to the sound discretion of the circuit court and will not be disturbed absent a manifest abuse of discretion. *Id.* Additionally, prejudice must have resulted. *Ralston v. State*, 2019 Ark. App. 175, 573 S.W.3d 607. An appellate court will not reverse the circuit court's ruling absent a showing of manifest abuse. *Id.* Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Id.*

The crux of Dillard's argument is that the text messages do not describe "acts" or "crimes" but were "electronic communications expressing sexual fantasies"; thus, they are not admissible as evidence of prior sexual conduct with children. His argument is not well taken.

Dillard admitted sending the text messages, and the texts were sent contemporaneously with the time he was sexually abusing A.L. Little testified that in the texts, Dillard stated that he wanted to have sex with the children and teach them how to perform oral sex. Similarly, A.L. testified that Dillard raped her and made her perform oral sex when she was eight years old. Here, the content of the text messages is proof of similar acts with the same child who lived in the same household, and the testimony regarding the content of the texts shows Dillard's proclivity toward a specific act with his then stepdaughter. We hold that the circuit court did not abuse its discretion in allowing testimony regarding the text messages under the pedophile exception.

The instant case is analogous to *Ralston*, *supra*, in which Ralston was convicted of one count of second-degree sexual assault and one count of rape of his nephew and another boy. Our court upheld the circuit court's admission of Ralston's statement to police during a traffic stop that he was sexually frustrated because he had not seen his two sons since he and their mother had divorced. We held that

> [t]he admitted statement was made by appellant, of his own volition, in 2009, which was around the same time he began his sexual encounters with A.H. and H.M., according to their testimony. His stated sexual frustration stemmed from not seeing his "boys," a term which appellant testified he used to refer to his own sons with whom he had a close relationship prior to his divorce from their mother. When he last encountered his "boys", they were "little" with one son being five and a half years old when he last saw him, around the same age as A.H. when appellant began assaulting him.

7

*Ralston*, 2019 Ark. App. 175, at 20–21, 573 S.W.3d at 620.

Dillard argues that *Ralston* is distinguishable from the instant case because here, the text conversation with Little is not a prior sexual act, and "*Ralston* involved a tacit admission to having sex with the underage males at issue, whereas the communication here involved fantasy rather than actual conduct." We disagree with Dillard's interpretation of *Ralston*. In *Ralston*, our court held that Ralston "voluntarily made a statement linking his sexual frustrations with being unable to see boys." *Id*. at 19, 573 S.W.3d at 620. Neither the circuit court nor our court characterized Ralston's statement as a tacit admission of sexual conduct with boys.

The circuit court did not abuse its discretion in admitting the testimony under the pedophile exception.

### 2. *Authentication*

Next, Dillard argues that the circuit court abused its discretion by admitting Little's testimony regarding the contents of the text exchange because the text messages were not properly authenticated. None of Dillard's objections at the pretrial hearing and during the trial were based on the authenticity of the text messages as he now argues. It is well settled that a party cannot change his argument on appeal. *Elliott v. State*, 2012 Ark. App. 126, at 3, 389 S.W.3d 100, 103. The argument is not preserved for our review.

### 3. *Best-evidence rule*

Lastly, Dillard argues that the circuit court's admission of the texts violated the best-evidence rule requiring original writings because the State did not attempt to obtain the text messages from the cell service provider. He is wrong. Arkansas Rule of Evidence 1004

(2019) provides that the original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if:

> (1) All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith;
>
> (2) No original can be obtained by any available judicial process or procedure;
>
> (3) At a time when an original was under the control of the party against whom offered, he was put on notice, by the pleadings or otherwise, that the contents would be a subject of proof at the hearing; and he does not produce the original at the hearing; or
>
> (4) The writing, recording or photograph is not closely related to a controlling issue.

Ark. R. Evid. 1004. Dillard asserts that if the original text messages are lost, then the State is required by subsections (1) and (2) to attempt to obtain the texts through judicial process. He misconstrues Rule 1004. In *Campbell v. State*, 2017 Ark. App. 59, at 6, 512 S.W.3d 663, 667, our court held that "Rule 1004 provides for several alternative situations in which such evidence may be admissible, including when the original has been lost or destroyed where there is no evidence of bad faith." Here, Rule 1004 does not require that the State had to show that the originals were lost *and* that no original could be obtained through any judicial process. The State showed that the originals were shown to be lost, and Dillard never alleged that the texts were lost or destroyed in bad faith; thus, the circuit court did not abuse its discretion in allowing the testimony regarding the text messages.

### B. Impeachment of the Victim with a Prior Statement

For the first of his remaining points on appeal, Dillard asserts that the circuit court abused its discretion by not allowing him to impeach A.L. with her prior statement regarding sexual conduct that occurred in 2014—three years after her 2011 rape. Dillard argues that

9

the Rape Shield Act does not exclude impeachment of the victim with a statement about prior sexual conduct when the conduct occurred *after* the time of the alleged rape. Additionally, he argues that because credibility of a witness is always relevant, the court's refusal to allow Dillard to impeach the victim with her prior inconsistent statement is reversible error. Due to a procedural error, this point is not preserved for appeal.

Arkansas Code Annotated section 16–42–101(c)(1) provides that if a defendant wishes to move to admit evidence of a victim's prior sexual conduct on the basis of relevancy, the defendant must file a written motion "at any time prior to the time the defense rests stating that the defendant has an offer of relevant evidence prohibited by subsection (b) of this section and the purpose for which the evidence is believed relevant."

Dillard never filed a written motion to request admission of the evidence regarding A.L.'s sexual conduct in 2014; thus, this issue is not preserved for our review. In *Stewart v. State*, 2012 Ark. 349, 423 S.W.3d 69, our supreme court held that Stewart's argument that the victim's previous sexual conduct was relevant to show that "she knew what sex was," was not preserved for myriad reasons, one of which was that a written motion was not filed as required by the statute:

> Next, even if appellant was asserting the same argument that he raised below, we hold that appellant failed to present his argument below as prescribed by Ark. Code Ann. § 16–42–101(c) and that appellant failed to make a proper proffer of the evidence he wished to present. First, as explained above, § 16–42–101(c) provides that evidence directly pertaining to the act upon which the prosecution is based or evidence of the victim's prior sexual conduct with any person may be admitted if its relevancy is determined by the court. To establish such relevancy, the defendant must file a written motion, before resting, stating that the defendant has an offer of relevant evidence prohibited by the statute and describing the purpose for which the evidence is believed relevant. § 16–42–101(c)(1).

*Stewart*, 2012 Ark. App. 349, at 9, 423 S.W.3d at 74.

10

In the present case, Dillard failed to follow the procedure set forth in Ark. Code Ann. § 16-42-101(c) for establishing relevancy and admissibility of evidence excluded by the Rape Shield Act, and we are prohibited from addressing the issue here.

## C. Denial of Dillard's Motion for a Mistrial

Next, Dillard argues that the circuit court erred by denying his motion for a mistrial when the State improperly questioned him about past-due child support. Dillard questioned Risner about her fears that her children might be taken from her during the investigation into 2011. Risner responded that she was not concerned about Dillard's getting the kids, and she opined that E.D., the child she has with Dillard, would be placed with Dillard's parents before he would be awarded custody. During cross-examination, the State asked Risner about Dillard's child in South Carolina to whom he had relinquished parental rights and did not support. Dillard objected, and the court found that "the defense has created an idea that she had a bias based on the fact that she was concerned about the children living with him, so I think this is fair game, based on a previous line of questioning. I'm going to overrule the objection." Dillard moved for a mistrial, which the court denied. The circuit court admonished the State to avoid questioning regarding issues of support. After discussing the merits and detriments of a curative instruction, the court offered the curative instruction as Dillard requested. During closing argument, the State told the jury that "he never had either one of his other kids. Might have lost them to his mom or something[.]" Dillard asserts on appeal that the mistrial should have been granted, and the curative instruction was inadequate to address the level of prejudice that resulted. We disagree.

11

A mistrial is an extreme and drastic remedy that will be resorted to only when there has been an error so prejudicial that justice cannot be served by continuing with the trial or when fundamental fairness of the trial has been manifestly affected. *Moore v. State*, 355 Ark. 657, 144 S.W.3d 260 (2004). Declaring a mistrial is proper only when the error is beyond repair and cannot be corrected by any curative relief. *Brown v. State*, 347 Ark. 308, 65 S.W.3d 394 (2001). The judge presiding at trial is in a better position than anyone else to evaluate the impact of any alleged errors. *Blanks v. State*, 2018 Ark. App. 495, 562 S.W.3d 865. Therefore, the circuit court has wide discretion in granting or denying a motion for mistrial, and the decision of the circuit court will not be reversed except for abuse of that discretion or manifest prejudice to the complaining party. *Id.*

Among the factors to be considered in determining whether a circuit court abused its discretion in denying a motion for mistrial are whether the prejudicial response was deliberately induced and whether an admonition to the jury could have cured any resulting prejudice. *McClinton v. State*, 2015 Ark. 245, 464 S.W.3d 913. Our supreme court has held that remarks amounting to inadvertent references to previous bad conduct of the defendant may be cured by an admonition from the circuit court ordering the jury to disregard the statement. *Id.*

In a similar case, *Poyner v. State*, 288 Ark. 401, 705 S.W.2d (1986), our supreme court held that the circuit court did not err in denying a request for a mistrial when the State questioned the mother of the children raped by Poyner about his past-due child support. The circuit court admonished the jury to disregard the remarks about Poyner's failure to pay child support, and our supreme court held that the curative instruction cured

12

any prejudice that may have resulted. The same is true here, and the circuit court did not err in refusing to grant a mistrial.

## D. *Wicks* Exception

Dillard argues that the State made two egregious errors in its closing argument that merited the court stepping in and declaring a mistrial despite his failure to object. First, the State thanked the jury for its service by explaining that in Saudi Arabia, the accused are shot by snipers or cut up and carried off in suitcases rather than given the benefit of a jury trial. Immediately after this statement, the prosecutor stated that "if you had a daughter or a son that said they had been sexually abused, you would want twelve people that came and paid real good attention and took lots of notes, because you guys have taken lots of notes." The State's comments during closing do not merit the *Wicks* exception, and we affirm.

Ordinarily, absent a contemporaneous objection at trial, our court will not review alleged errors in the State's closing argument. *Lard v. State*, 2014 Ark. 1, 431 S.W.3d 249. However, Dillard argues that this court should review this issue on appeal despite his failure to object under the third *Wicks* exception. The third exception announced in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), is as follows:

> A third exception is a mere possibility, for it has not yet occurred in any case. That relates to the trial court's duty to intervene, without an objection, and correct a serious error either by an admonition to the jury or by ordering a mistrial. We implied in *Wilson v. State*, 126 Ark. 354, [359,] 190 S.W. 441 [,443] (1916), that no objection is necessary if the trial court fails to control a prosecutor's closing argument and allows him to go too far: "Appellant cannot predicate error upon the failure of the court to make a ruling that he did not at the time ask the court to make, unless the remarks were so flagrant and so highly prejudicial in character as to make it the duty of the court on its own motion to have instructed the jury not to consider the same.

*Wicks*, 270 Ark. at 786, 606 S.W.2d at 369–70. *Wicks* presents only narrow exceptions that are to be rarely applied. *Chunestudy v. State*, 2012 Ark. 222, 408 S.W.3d 55. Specifically, our supreme court has held that the third exception is limited to only those errors affecting the very structure of the criminal trial, such as the fundamental right to a trial by jury, the presumption of innocence, and the State's burden of proof. *Lard*, *supra*.

Here, the State's statements during closing did not affect the structure of the trial and do not merit application of the third *Wicks* exception. We note that our appellate courts have repeatedly refused to apply the third *Wicks* exception in the context of closing arguments. *See Jenkins v. State*, 2019 Ark. App. 419, 582 S.W.3d 32 (Our court did not apply *Wicks* when the State urged jury to "protect our children," not to "fail this community to protect any child," and compared the child victim to the members of the U.S. Women's Gymnastics Team abused by their doctor.).

E. Reopening the Case

Dillard asserts that the circuit court erred in allowing the State to present identification evidence after his directed-verdict motion, causing extreme prejudice to him. We disagree.

A motion for a directed verdict allows the circuit court the option of granting it or allowing the prosecution to reopen its case to supply the missing proof. *Henry v. State*, 2011 Ark. App. 169, 378 S.W.3d 832. The circuit court's power to permit the State to reopen its case after parties have rested is discretionary, and the decision to reopen will not be reversed absent an abuse of that discretion. *Id*. The rationale behind the rule of criminal procedure requiring a defendant to make a specific motion for directed verdict based on

14

insufficiency of the evidence at the close of the State's evidence and at the close of all the evidence is that when specific grounds are stated and the absent proof is pinpointed, the circuit court can either grant the motion or, if justice requires, allow the State to reopen its case and supply the missing proof. *Webb v. State*, 2019 Ark. App. 436, 587 S.W.3d 252.

At the close of the State's case, Dillard moved for a directed verdict arguing that the State did not present sufficient evidence identifying Dillard as the person who had committed the crimes. The State responded that A.L. testified that Dillard had raped her and that even without an in-court identification, there was sufficient testimony to identify Dillard as the person who had raped A.L. Even so, the State requested that the court allow the State to reopen the case and allow the victim to identify Dillard in the courtroom. The court allowed the State to reopen the case over Dillard's objection that it would be "highly prejudicial and somewhat confusing and weird for the jury[.]" A.L. returned to the stand, pointed to Dillard, and identified him as the man who had raped her. Dillard renewed his directed-verdict motion, and the motion was denied.

Here there was no surprise, prejudice, or confusion regarding Dillard's identification. A.L. stated that her stepfather "Shane" Dillard had raped her, and reopening the case did no more than make clear what was already obvious to the jury. Identification can be inferred from all the facts and the circumstances in evidence. *See Holloway v. State*, 312 Ark. 306, 312, 849 S.W.2d 473, 476 (1993). We find no error and hold that the circuit court did not abuse its discretion in allowing the State to reopen its case.

F. Summary of Prior Statement

Dillard argues that the circuit court erred in refusing his request to both refresh Risner's recollection and also to impeach Risner using a summary of her statement to police. This issue is not preserved for our review.

Risner testified that A.L. had been in therapy for ADHD for several years before 2011. Risner explained that A.L. did not attend therapy in Corning in 2011, but she resumed therapy when they moved to Paragould in 2012. On cross-examination, Dillard confronted Risner about her statement that A.L. was not in therapy in 2011, as follows:

| DEFENSE COUNSEL: | She wasn't. Amber, that's not what you said in August of 2011, is it? |
| RISNER: | I'm sorry? |
| DEFENSE COUNSEL: | On August 23, 2011 you stated that – |

The State objected and stated that to impeach a witness with a prior inconsistent statement, the witness must be allowed to review the statement. The State noted that the statement appeared to be a police summary of her statement and not a transcript of her statement. The court concluded that reading from a summarized report was not permissible, and Dillard agreed to rephrase his question to something more like "do you remember telling this to the . . . ." Cross-examination continued, and Dillard asked Risner if she remembered saying that A.L. had been in therapy in 2011, and Risner replied that she could not. Dillard asked, "If I refreshed your memory, would it help?" The State objected that a transcribed statement could be used to impeach a witness but that a summary by state police investigators was not appropriate for impeachment. The court stated, "I don't think you can

impeach from a summary without an actual transcript. I don't think that is the proper way to impeach a witness." The court sustained the State's objection.

Risner's alleged prior inconsistent statement and the contents of the summary were never proffered. This is fatal to Dillard's argument on appeal. In *Ball v. State*, 2012 Ark. App. 665, our court held that whether a prior statement contained on a videotape was admissible for impeachment purposes was not preserved because the video was never proffered at trial. Our court held that

> Ball did not proffer the excluded videotaped statement at trial. It was never heard by the trial court, and as such it is not part of the record on appeal. Here, Ball's failure to make a proffer of the excluded evidence creates an insufficient record for our review, and the issue is not preserved for appeal.

*Ball*, 2012 Ark. App. 665, at 1–2. Likewise, here, Dillard did not proffer the summary and the summary is not in the record; thus, the issue is not preserved for appeal.

Moreover, though Dillard couches his attempt to use the police summary to refresh Risner's memory, the court treated the attempt as impeaching the witness with a prior statement. Dillard never asked the court to rule specifically on refreshing a witness's recollection, and the court never ruled on refreshing a witness's recollection, only as an impeachment; thus, any argument that he should have been allowed to use the summarized statement to refresh Risner's recollection is also not preserved. For the reasons stated above, we affirm.

Affirmed.

GLADWIN and WHITEAKER, JJ., agree.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brooke Jackson Gasaway*, Ass't Att'y Gen., for appellee.